**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| JOSEPH KLAYNBERG, | : | Case No. 22-10165 (MG) |
| | : | |
| Debtor. | : | |

---------------------------------------------------------------x

| | | |
|---|---|---|
| SERIES 2020A OF NAHLA CAPITAL LLC, | : | |
| | : | |
| Plaintiff, | : | Adv. Pro. No. _____ (MG) |
| v. | : | |
| | : | |
| JOSEPH KLAYNBERG, | : | |
| | : | |
| Defendant. | : | |

---------------------------------------------------------------x

<u>**COMPLAINT OBJECTING TO DISCHARGE**</u>

Plaintiff Series 2020A of Nahla Capital LLC ("<u>Nahla</u>" or "<u>Plaintiff</u>"), by its undersigned counsel, brings this action against Joseph Klaynberg (the "<u>Debtor</u>"), and alleges as follows:

<u>**NATURE OF THE ACTION**</u>

1.      The Debtor has engaged in a blatant scheme to move his assets into the hands of his family members and their affiliated entities, including to his (now former) spouse and three adult sons, in an effort to hinder and delay Nahla's ability to collect on a prepetition judgment against the Debtor for over $13 million.

2.      By this action, Plaintiff seeks a judgment from the Court determining that the Debtor is not entitled to a discharge pursuant to sections 1141(d)(3) and 727(a) of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>") both as a result of (a) the Debtor's fraudulent transfers made post-petition and within one year prior to the petition date, and (b) the Debtor knowingly and fraudulently submitting false testimony in the bankruptcy case.

## PARTIES

3.    Nahla is a creditor in the Debtor's bankruptcy proceeding, Case No. 22-10165 (the "Bankruptcy Case").

4.    Nahla is a registered Series of Nahla Capital LLC, a limited liability company established under Delaware law.  Nahla has offices located at 645 Madison Avenue, 21st Floor, New York, New York 10022.

5.    Upon information and belief, the Debtor is an individual residing at 8 East 48th Street, Apt. 4C, New York, New York 10017.

## JURISDICTION AND VENUE

6.    On February 11, 2022 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court, commencing the Bankruptcy Case.

7.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334, as this adversary proceeding is related to the Bankruptcy Case.

8.    Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409.

9.    This is a core proceeding pursuant to 28 U.S.C. 157(b)(2)(A), (J), and (O).

10.    Plaintiff consents to the entry of final orders or judgment by the Court in this adversary proceeding.

## FACTUAL ALLEGATIONS

**A.    The Debtor Guaranties a Loan Held by Nahla.**

11.    Prior to the Petition Date, the Debtor was engaged in the residential construction and development business.

12.     The Debtor's business included the construction and development of a luxury condominium known as "The Vitre" located at 302-304 East 96th Street, New York, NY 10128 (the "Vitre Property").

13.     Construction and development of the Vitre Property was financed by two loans – a senior loan in the original principal amount of approximately $43 million (the "Senior Loan"), and a mezzanine loan in the original principal amount of approximately $24.9 million (the "Mezz Loan").

14.     Those loans were made pursuant to loan agreements (the "Senior Loan Agreement and the "Mezz Loan Agreement," respectively) to entities controlled, and ultimately owned in part, by the Debtor - WWML96 DE, LLC (the "Mortgage Borrower") and WWML96 DE Mezz, LLC (the "Mezz Borrower," together with the Mortgage Borrower, the "Borrowers").

15.     As security for the Mezz Loan, the Mezz Borrower pledged, among other things, the equity interests (the "Pledged Collateral") in an entity which, through its ultimate ownership of the Mortgage Borrower, owned the Vitre Property.

16.     The Debtor and his business partner, Eric Brody ("Brody"; together with the Debtor, the "Guarantors") guarantied certain of the Mezz Borrower's obligations under the Mezz Loan Agreement pursuant to guaranty agreements (collectively, the "Guaranties").

17.     Meadowbrooke Limited ("Meadowbrooke"), an entity for which Nahla Capital Management, LLC ("Nahla Capital") is the investment manager, acquired the Mezz Loan in May 2019.

18.     Meadowbrooke subsequently assigned the Mezz Loan to Nahla, another entity managed by Nahla Capital, in September 2020.

**B.      Nahla Exercises Remedies Following Defaults.**

19.      On January 1, 2020—two months before the onset of the COVID-19 pandemic—the Mezz Borrower defaulted on the Mezz Loan.  Over the next several months, Nahla (and its predecessor, Meadowbrooke) refrained from exercising remedies and engaged in extensive settlement discussions with the Mezz Borrower.  In connection with these settlement discussions, the parties entered into a forbearance agreement dated January 31, 2020 (the "Forbearance Agreement").

20.      On April 1, 2020, the Mezz Borrower defaulted under the Mezz Loan Agreement and the Forbearance Agreement.  The Mortgage Borrower simultaneously defaulted under the Senior Loan Agreement.  Since then, the Mezz Borrower failed to make any further interest payments or any other required payments under the Mezz Loan Agreement.

21.      When it became clear that the Mezz Borrower could not (or would not) pay the amounts owed, Nahla elected to sell the Pledged Collateral at a public sale under the New York Uniform Commercial Code (the "UCC").

22.      On October 1, 2020, Nahla sent a notification of disposition of collateral (the "UCC Sale Notice") to the Borrowers and the Debtor, among other parties, notifying those parties that the Pledged Collateral would be sold at a public UCC sale on December 8, 2020.

23.      The next day, on October 2, 2020, Nahla sent a letter (the "October 2, 2020 Demand Letter") to the Guarantors demanding payment of the amount then due under the Guaranties.

24.      On December 8, 2020, the Pledged Collateral was sold at a public UCC sale (the "UCC Sale").  After several rounds of competitive bidding between Nahla and an independent, third party bidder, Nahla purchased the Pledged Collateral with a credit bid of $5 million.

25.    The Mezz Borrower unsuccessfully challenged the reasonableness of the UCC Sale in a declaratory judgment action filed in the New York Supreme Court, New York County (the "NY Court"), Index No. 656721/2020 (the "UCC Challenge Litigation").  In that action, the NY Court found that the UCC sale was commercially reasonable and, on October 12, 2021, entered a decision granting Nahla's motion for summary judgment and dismissing the Mezz Borrower's complaint, with prejudice.

26.    On January 18, 2021, Nahla commenced an action in the NY Court against the Guarantors (the "Guaranty Litigation") for the outstanding amount owed on the Mezz Loan (net of amounts credit bid at the UCC Sale).

27.    In a decision dated April 14, 2021, the NY Court found that the Guarantors (including the Debtor) were liable under the Guaranties for the entire balance of Nahla's loan due to the Guarantors having caused the Borrowers to (a) sell a condominium unit in the Vitre Property to an entity managed by, and partially owned by, the Debtor and/or the Debtor's son Daniel Klaynberg ("Daniel"), without lender consent, and (b) assert a baseless challenge to the UCC Sale.

28.    On November 17, 2021, judgment was entered in the Guaranty Litigation in favor of Nahla and against the Guarantors, jointly and severally, for $13,196,612.65 (the "Judgment").

**C.    The Debtor Implements His Asset Protection Scheme.**

29.    As Nahla engaged in supplementary proceedings to collect on the Judgment, it became clear that the Debtor already had put into motion a scheme to place the Debtor's assets beyond the reach of Nahla.

30.    The cornerstone of this asset protection scheme involved the Debtor's attempt to transfer assets, including substantially all of his liquid assets, to his (now former) spouse, Emily Klaynberg ("Emily"), through a strategically timed separation and divorce.

### 1.      *The Debtor's Divorce and Separation Agreement*

31.      The Debtor and Emily married on January 9, 1983.

32.      According to the Debtor and Emily, their marriage had been strained since 2000 and ended (in a non-legal sense) when the Debtor moved out of their residence in Sands Point, NY (the "Sands Point Residence") shortly following an argument on New Year's Eve 2016/2017.

33.      The Debtor and Emily did not legally separate or divorce after that New Year's Eve 2016/2017 argument.

34.      Rather, they only started seriously discussing separation and divorce no earlier than in Spring 2020, years after the alleged argument and after the Vitre Property went into default.

35.      The Debtor only began pursuing a separation and division of assets with Emily in earnest after he was served with the UCC Sale Notice and October 2, 2020 Demand Letter.

36.      To that end, the Debtor retained Dina De Giorgio ("De Giorgio") as matrimonial counsel and, on October 16, 2020, held a telephone conference with De Giorgio and Scott Flynn ("Flynn"), the Debtor's accountant, to discuss a separation agreement.

37.      Emily was not at any point represented by counsel in connection with the separation and subsequent divorce.

38.      Rather, Emily was advised only by her and the Debtor's son, Daniel.

39.      Daniel is not an attorney.

40.      The Debtor's separation from Emily was not contentious.

41.      There were no significant negotiations between the Debtor and Emily regarding the separation agreement or how assets would be separated in the divorce.

42.      The Debtor and Emily agreed that Emily would retain the Sands Point Residence and the proceeds from the sale of their NYC apartment located at 5 East 16th Street in NYC (the

"East 16th Condo"), and that the Debtor would retain his equity investment interests in various corporate entities, as well as his and Emily's financial investment accounts at Charles Schwab.

43.     That understanding was memorialized in a spreadsheet sent from Flynn to the Debtor on November 11, 2020.

44.     Despite this understanding, Flynn thereafter sent the Debtor a number of alternative proposals later that day, with a revised version labeled "Scenario 3" in which Emily retained not only the East 16th Condo and the vast majority of the Charles Schwab accounts, but also a 50% interest in the Sands Point Residence (and right to occupy that residence), and contained the following note:

> Note: in order to entice Emily to agree, a disproportionate amount of assets are being allocated to Emily so that she has control of the liquid assets and does not have to worry whether or not the businesses will provide sufficient cash flow to pay her the maintenance in the future. This keeps things status quo for her given the fact that she is currently paying all the household living expenses from the Schwab accounts and she is uncomfortable giving up that access.

45.     In reality, Emily never expected or discussed maintenance payments or expressed any concern regarding the Charles Schwab accounts.

46.     The Debtor and Emily ultimately entered into a Separation Agreement (the "Separation Agreement") dated November 17, 2020 (the "Separation Date").

47.     Emily did not read the Separation Agreement, except for maybe the first page, and she signed it at the Debtor's direction.

48.     The Separation Agreement, among other things, addressed the division of cash and securities in two accounts: a Charles Schwab Account ending in **8488 (the "8488 Schwab Account"), and a Metropolitan Commercial Bank Account ending in **0346 (the "MCB Account" or "0346 Account").

49.     Between the two accounts, Emily was to receive approximately $8,516,973 in cash and securities, while Debtor was to receive $369,853 in cash, $300,000 of which was to be transferred from the 8488 Schwab Account.

50.     The Separation Agreement also addressed ownership in three residences: (1) the Debtor and Emily would own the Sands Point Residence as tenants in common, with Emily entitled to occupancy; (2) Emily would receive proceeds from the sale of the East 16th Condo, provided that she satisfy the outstanding mortgage on the Sands Point Residence; and (3) the parties' interests in an apartment located at 150 Central Park South would be gifted to Debtor and Emily's son, Robert Klaynberg.

51.     The Debtor filed a complaint for divorce on December 2, 2020, only six days before the scheduled UCC Sale.

52.     The entire divorce proceeding took less than two months.

53.     A judgment of divorce (the "Divorce Judgment") was issued on January 22, 2021, and entered on February 5, 2021.

54.     Emily appeared in the divorce proceeding solely to consent to place the matter on the uncontested divorce calendar, thus allowing for the immediate review of the Debtor's divorce papers by the court.

55.     The Debtor and Emily did not publicly announce their divorce, and some of their friends still did not know of the divorce as of August 2022.

### 2.    *The Debtor and Emily Fail to Adhere to the Separation Agreement*

56.     The Debtor and Emily did not adhere to the terms of the Separation Agreement.

57. Emily did not pay the mortgage on the Sands Point Residence (of approximately $1.3 million) upon her receiving $3.7 million in net proceeds from the sale of the East 16th Condo in May 2021.

58. The Debtor was well aware of Emily's obligation to pay the mortgage on the Sands Point Residence, but chose not to enforce his rights.

59. The Debtor also did not withdraw the $300,000 from the 8488 Account pursuant to the Separation Agreement, and instead all of the cash and securities contained in the 8488 Account were transferred to Emily in January 2021.

### 3. The Debtor and Emily Continue to Use Joint Accounts.

60. The Debtor and Emily continued to jointly own and use bank and investment accounts following their separation and divorce.

61. For example, the Debtor and Emily continued to jointly hold a Charles Schwab account ending in **8438 (the "8438 Account"), which contained approximately $96k in cash and $2.4 million in securities as of the Separation Date.

62. The 8438 Account served as collateral for a loan from M&T Bank to Wonder Works Construction Corp. ("Wonder Works") which was guaranteed by the Debtor and Emily.

63. Wonder Works was founded by the Debtor. The Debtor served as President of Wonder Works at all times prior to the Petition Date.

64. The Debtor owned no less than 42% of the equity interests in Wonder Works as of the Petition Date, and controlled Wonder Works at all times relevant to the Complaint.

65. On November 22, 2021, just five days after the Nahla Judgment was entered against the Debtor, the Debtor paid, from the 8438 Account, the approximate $1.5 million outstanding balance of a loan from M&T Bank to Wonder Works (such transfer, the "M&T Bank Transfer").

66.     Upon information and belief, at the time the Debtor paid the balance of the loan from M&T Bank, Wonder Works was owned by the Debtor, Brody, and the Wonder Works Employee Stock Ownership Plan, for the benefit of employees which include Daniel.

67.     By making the M&T Bank Transfer, the Debtor and Emily now had the ability to access the amounts remaining in the 8438 Account free of any M&T Bank security interest.

68.     On March 1, 2022, following the Petition Date, the Debtor transferred to Emily the entire remaining balance of the 8438 Account, comprised of over $937,000 in cash.

69.     In his schedules filed on February 11, 2022 (the "Petition Date"), the Debtor initially identified $937,040.00 held in the 8438 Account as property of the estate.  The Debtor later amended his schedules to provide that the 8438 Account belongs to Emily, even though the Separation Agreement does not address the treatment of this account.

70.     At no point did the Debtor seek or obtain Bankruptcy Court authority for a transfer of his interest in the 8438 Account to Emily.

71.     The Debtor and Emily also continued to jointly hold Charles Schwab accounts ending in **5497 (the "5497 Account") and **7457 (the "7457 Account") during the period following the Separation Date.

72.     On March 1, 2022, the Debtor transferred approximately half of the cash in the 5497 Account to Emily, and the other half to his debtor in possession account.

73.     The 7457 Account contained approximately $6,845 in cash as of the Petition Date.

74.     The Debtor never disclosed the existence of the 7457 Account on his bankruptcy schedules, except to note that a Charles Schwab joint checking account belongs to Emily pursuant to the Separation Agreement.  In fact, the Separation Agreement makes no mention of the 7457 Account or how the cash in that account should be distributed.

75.     Brazenly, the Debtor even used his Wonder Works corporate credit card to purchase airline tickets for Emily and her friends on February 22, 2022, just eleven days after filing the Bankruptcy Case.

### 4.     The WW Spectra Transfers

76.     The Debtor further perpetuated his asset protection scheme through transfers of cash and securities to family members and affiliated entities, using both his own accounts and business entities that he controlled.

77.     A number of these transfers involve the Debtor's attempt to transfer to Daniel and other family members the Debtor's business interests in the "Spectra" project, which is the name given to the Debtor's construction and development projects in Hartford, Connecticut.

78.     Certain assets relating to the Spectra project were held by WW Spectra Corp. ("WW Spectra"), a New York corporation.

79.     The Debtor served as the President and sole shareholder of WW Spectra from the time of its organization in or about January 2017 through at least September 30, 2020, after which the Debtor continued to serve as President and fifty percent (50%) shareholder.

80.     The Debtor used WW Spectra to pay for personal expenses.  For example, the Debtor caused WW Spectra to pay, in part, his retainer for bankruptcy counsel in the Bankruptcy Case.

### (i)     The Debtor Transfers Equity in WW Spectra to Daniel

81.     Through an assignment dated September 30, 2020, the Debtor transferred 50% of the equity interests in WW Spectra to Daniel (the "WW Spectra Equity Transfer").

82.     Upon information and belief, the Debtor received no significant consideration in exchange for the WW Spectra Transfer.

### (ii)    The Debtor Backdates Transfers of Equity in Spectra 101 and Spectra 111 to Klaynberg Family Group

83.    WW Spectra owned, among other things, a 24.18% equity interest in Spectra 101, LLC ("Spectra 101"), and a 27.47% equity interest in Spectra 111, LLC ("Spectra 111") (these equity interests, collectively, the "Spectra 101 & 111 Equity Interests").

84.    Through assignment agreements entered into "as of" January 1, 2020 (and signed by the Debtor on behalf of WW Spectra) (the "Spectra Assignment Agreements"), the Debtor caused WW Spectra to assign the Spectra 101 & 111 Equity Interests (the "Spectra 101 & 111 Transfers") to Klaynberg Family Group, LLC ("KFG"), ostensibly for "bona fide estate planning purposes."

85.    The Debtor held only a 10% interest in KFG at the time of the Spectra 101 & 111 Transfers, with the other 90% held in a trust for which the Debtor's family members (including Daniel) are beneficiaries.

86.    Upon information and belief, neither the Debtor nor WW Spectra received any significant consideration in exchange for the Spectra 101 & 111 Transfers.

87.    Although dated "as of" January 1, 2020, the Spectra Assignment Agreements were not actually signed until years later.  The Debtor backdated the Spectra Assignment Agreements in an effort to conceal the fact that the Spectra 101 & 111 Transfers were made with the intent to hinder and delay Nahla's efforts to collect on its guaranty claims against the Debtor.

88.    As of March 2021, the Debtor still was undecided as to whether to assign the Spectra 101 & 111 Equity Interests from WW Spectra to KFG.  This is made clear by an email from the Debtor to Scott Flynn (his accountant) dated March 23, 2021, wherein the Debtor asks Flynn "[A]re we definitely [going] to assign shares/distributions [for Spectra 101] to Klaynberg Family Group?"  Mr. Flynn replied in the affirmative, noting that he would review the estate

planning documents in place to see what needs to be changed given "the current circumstances. (Emily, litigation, etc.)."  Flynn's reference to "litigation" was intended to refer to Nahla's litigation against the Debtor on its guaranty claim.

89.     The Spectra Assignment Agreements were not actually executed until at least June 2022.

### *(iii)     The Debtor Makes Transfers to and from WW Spectra for the Benefit of Daniel*

90.     WW Spectra also held 50% of the equity interests in Spectra Development, LLC ("Spectra Development").

91.     In or about December 2020, Daniel acquired the other 50% of the equity interests in Spectra Development from a third party.

92.     On December 22, 2020, the Debtor caused WW Spectra to transfer $120,000 to Daniel.

93.     On January 15, 2021, the Debtor caused WW Spectra to transfer an additional $120,000 to Daniel.

94.     On or about November 19, 2021, the Debtor transferred $81,270 from his personal account to WW Spectra (the "Nov 19, 2021 Cash Transfer"), which subsequently was booked as a loan from WW Spectra to Spectra Development.

95.     On January 18, 2022, the Debtor caused WW Spectra to transfer an additional $303,000 to Daniel, booked as a loan (the "Jan 18, 2022 WW Spectra Cash Transfer").

96.     Between August 11, 2021 and January 18, 2022, the Debtor caused WW Spectra to transfer an aggregate amount of no less than $228,000 to Spectra 275, LLC ("Spectra 275") as follows (collectively, the "Spectra 275 Transfers"):

| Date | Amount |
|---|---|
| 8/11/21 | $50,000 |
| 10/13/21 | $50,000 |
| 11/19/21 | $14,000 |
| 1/18/22 | $114,000 |
| **Total** | $228,000.00 |

97.    Between August 9, 2021 and January 18, 2022, the Debtor caused WW Spectra to transfer an aggregate amount of no less than $181,000 to Spectra 525, LLC ("Spectra 525") as follows (collectively, the "Spectra 525 Transfers"):

| Date | Amount |
|---|---|
| 8/9/21 | $50,000 |
| 9/14/21 | $16,000 |
| 10/13/21 | $34,000 |
| 1/18/22 | $81,000 |
| **Total** | $181,000.00 |

98.    At the time of the Spectra 275 Transfers and the Spectra 525 Transfers, each of Daniel and JDL Spectra (defined below) held 50% of the equity interests in Spectra 275 and Spectra 525.

99.    The Debtor held equity interests in Spectra 275 and Spectra 525 at the time of their formation in or about July 2021.  Upon information and belief, the Debtor transferred his equity interests in Spectra 275 and Spectra 525 to Daniel and/or JDL Spectra after July 2021 and prior to the Petition Date (the "Spectra 275 & 525 Equity Transfers").

100.    Between October 13, 2021 and November 18, 2021, the Debtor caused WW Spectra to transfer an aggregate amount of no less than $195,570 to or for the benefit of Spectra Development, inclusive of the $81,270 described above (collectively, the "Spectra Development Transfers"; and together with the Spectra 275 Transfers, the Spectra 525 Transfers, and the Jan 18, 2022 WW Spectra Cash Transfer, the "WW Spectra Cash Transfers"), as follows:

| Date | Amount |
|------|--------|
| 10/13/21 | $10,800 |
| 11/9/21 | $103,500 |
| 11/18/21 | $81,270 |
| **Total** | $195,570.00 |

101.    The Spectra Development Transfers made on October 13, 2021 and November 9, 2021 were made in connection with the purchase of certain real property located at 1 Gold Street, Unit 17G, Hartford, Connecticut, and related parking space (the "1 Gold Property").  WW Spectra assigned the purchase agreement for the 1 Gold Property to Spectra Development in or about November 2021 (the "1 Gold Property Assignment").  Upon information and belief, WW Spectra received no consideration for the 1 Gold Property Assignment.

102.    Upon information and belief, the 1 Gold Property currently is used by JDL Spectra, Spectra Development, Spectra Construction and Development Corp., and other entities created by Daniel.

### 5.    *The JDL Spectra Transfers*

103.    On November 17, 2021 (the same day as entry of Nahla's Judgment), Daniel formed JDL Spectra LLC ("JDL Spectra"), with the Debtor (Joseph), Daniel, and Leonid Skutelsky as members.

104.    Upon information and belief, the name "JDL" was selected by using the first initial of each of the three original members.

105.    In December 2021, cash transfers in the amounts of $126,360 and $55,640 were made to JDL Spectra from the Debtor's and Emily's 7457 Account (the "Cash Transfers to JDL").

106.    Upon information and belief, at some point between November 17, 2021 and the Petition Date, the Debtor transferred his equity interests in JDL Spectra to Emily (the "JDL Spectra Equity Transfer"), and the Debtor no longer retained any interest in JDL Spectra.

107.    Upon information and belief, the Debtor received no significant consideration in exchange for the JDL Spectra Equity Transfer.

### 6.    *The Debtor's Cash Gifts to Friends and Family*

108.    The Debtor made a number of cash gifts to friends and family during the period following the Vitre Property default and Nahla's pursuit of guaranty claims.

109.    On or about August 27, 2020, the Debtor transferred $100,000 to Daniel.

110.    On April 27, 2021, the Debtor transferred $12,000 to his and Emily's son Edward Klaynberg (the "Edward Cash Gift").

111.    According to his statement of financial affairs, the Debtor transferred at least $12,200 to Alena Diploti, who the Debtor describes as a significant other, during the period between November 2020 and June 2021 (such transfers made on or after February 11, 2021, the "DiPloti Cash Gifts," and together with the Edward Cash Gift, the "One Year Cash Gifts").

### D.    The Debtor's Bankruptcy Case.

112.    On the Petition Date, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court, commencing the Bankruptcy Case.

113.    The Debtor is retired according to his deposition testimony given on July 29, 2022 and other pleadings filed with the Court.

114.    On May 24, 2022, Nahla, the Debtor, Emily, and Brody participated in mediation, which was unsuccessful.

115.    On August 17, 2022, Nahla filed a motion for appointment of a chapter 11 trustee in the Bankruptcy Case, which motion was opposed by the Debtor.

116.    On September 19, 2022, the Court entered a memorandum opinion and order granting Nahla's motion for appointment of a chapter 11 trustee.  In that opinion, the Court found,

among other things, that the Debtor's divorce from Emily appears to "clearly serve as a fraudulent means of transferring the Debtor's assets."

117.    On September 20, 2022, the U.S. Trustee's office appointed Jonathan L. Flaxer as chapter 11 trustee (the "Trustee"), which appointment the Court approved by order signed and entered on September 23, 2022.

118.    On May 30, 2023, the Trustee filed the *Chapter 11 Trustee's First Amended Chapter 11 Plan of Liquidation* (as amended, the "Plan") in the Bankruptcy Case.

119.    The Plan provides for the liquidation of all or substantially all of the property of the Debtor's estate.

120.    The Plan further provides that the Debtor shall not receive a discharge to the extent discharge is denied pursuant to sections 1141(d)(3) and 727(a) of the Bankruptcy Code.

121.    The first date set for the hearing on confirmation of the Plan was July 19, 2023.

**E.      The Debtor Submits False Testimony in Connection With the Bankruptcy Case.**

*1.      The Sept 7, 2022 Affidavit*

122.    The Debtor signed and filed an affidavit, dated September 7, 2022, in support of his opposition to Nahla's application for appointment of a chapter 11 trustee in the Bankruptcy Case (the "Sept 7, 2022 Affidavit").

123.    Through the Sept 7, 2022 Affidavit, the Debtor falsely testifies that the Spectra 101 & 111 Transfers were made "long before the Nahla Judgment was even a blip on the radar," meaning in January 2020.  *See* Sept 7, 2022 Affidavit at ¶ 32.

124.    In reality, as set forth above, the Spectra 101 & 111 Transfers were made much later, well after Nahla had filed the Guaranty Litigation.  The Spectra Assignment Agreements, which purport to effectuate the Spectra 101 & 111 Transfers, were not signed until at least June

2022, **almost a year after** the Nahla Judgment was entered, and merely backdated with an "as of" date of January 1, 2020.

125.   The Debtor knew that he was submitting false testimony in connection with the Spectra 101 & 111 Transfers, and did so with the intent to defraud Nahla and the Court.

126.   This is made clear by the fact that the Debtor executed the Spectra Assignment Agreements sometime between June 10, 2022 and July 1, 2022.  Flynn had sent the Spectra Assignment Agreements to the Debtor for signature in June 10, 2022, and again on June 13, 2022, less than three months prior to the Debtor submitting his affidavit.  Fully executed Spectra Assignment Agreements were produced by the Debtor to Nahla on or about July 1, 2022.

127.   The Debtor also falsely testifies in the Sept 7, 2022 Affidavit that his full recourse liability to Nahla under the Guaranties was triggered only as a result of his and the Mezz Borrower's unsuccessful attempt to challenge the UCC Sale.  *See* Debtor's Affidavit at ¶ 15.

128.   The NY Court found that the Debtor's full recourse liability was triggered not only by his baseless challenge to the UCC Sale, but also as a result of having caused the Borrowers to sell a condominium unit in the Vitre Property to an entity managed by, and partially owned by, the Debtor and/or Daniel, without lender consent.

129.   The Debtor knew that he was submitting false testimony as to reasons for his full recourse liability, and did so with the intent to defraud Nahla and the Court.

130.   This is made clear by the fact that the NY Court expressly found otherwise, in a decision entered on April 14, 2021, a copy of which was filed on the Court's docket in the Bankruptcy Case on March 9, 2022.

### 2.     The Lar-Dan Affidavits and Schedules

131.     The Debtor also misrepresented his relationship with the affiliated entities that funded his professionals' prepetition retainers in the Bankruptcy Case.

132.     The Debtor's retainer paid to Cullen & Dykman LLP was funded, in part, by a transfer from WW Spectra.

133.     The Debtor executed an affidavit which he filed on March 4, 2022 in support of his application for retention of Cullen & Dykman LLP as Debtor's counsel (the "Mar 4, 2022 Affidavit").

134.     In the March 4, 2022 Affidavit, the Debtor falsely testifies that WW Spectra is not a creditor of the Debtor separate and apart from the retainer funded by that entity.  *See* Mar 4, 2022 Affidavit at ¶ 5.

135.     In reality, the Debtor is owed no less than $284,278 from WW Spectra as of the Petition Date on account of his shareholder loans to that entity (the "WW Spectra Receivable").

136.     The Debtor also failed to identify the WW Spectra Receivable on his official bankruptcy schedules (as amended, the "Schedules").

137.     The Debtor knew that he was submitting false testimony with respect to the WW Spectra Receivable, and did so with the intent to defraud Nahla and the Court.

138.     This is made clear by the fact that the WW Spectra Receivable is identified in WW Spectra's books and records.

139.     The Debtor also executed an affidavit, dated February 24, 2022, which he filed on March 4, 2022 in support of his application for retention of Thaler Law Firm PLLC as Debtor's special bankruptcy counsel (the "Feb 24, 2022 Affidavit"; together with the Mar 4, 2022 Affidavit, the "Lar-Dan Affidavits").

140.    The Debtor's retainer paid to Thaler Law Firm PLLC was funded by Wonder Works.

141.    In the Feb 24, 2022 Affidavit, the Debtor falsely testifies that Wonder Works is not a creditor of the Debtor and "does not owe any money to the Debtor." *See* Feb 24, 2022 Affidavit at ¶¶ 8-9.

142.    In reality, the Debtor is owed no less than $357,161.00 from Wonder Works as of the Petition Date (the "Wonder Works Receivable").

143.    The Debtor knew that he was submitting false testimony with respect to the Wonder Works Receivable, and did so with the intent to defraud Nahla and the Court.

144.    This is made clear by the fact that the Debtor identifies the Wonder Works receivable on his Schedules.

145.    A timeline illustrating the chronology of certain key events relevant to this Complaint is set forth on **Exhibit 1** hereto.

## COUNT I
### Objection to Discharge
### 11 U.S.C. §§ 1141(d)(3) and 727(a)(2)(B)

146.    Plaintiff repeats each and every allegation aforementioned as if set forth at length herein.

147.    The Plan provides for the liquidation of all or substantially all of the property of the Debtor's estate.

148.    The Debtor will not be engaged in business after consummation of the Plan.

149.    The Debtor would be denied a discharge under section 727(a) of the Bankruptcy Code if this case were a case under chapter 7, because the Debtor, with intent to hinder, delay or defraud Nahla, transferred or concealed, or permitted to be transferred or concealed, property of his estate after the Petition Date, including by: (a) transferring the entire $937,0040 balance held

in the 8438 Account to Emily on March 1, 2022 (the "Mar 1, 2022 Transfer"); and (b) executing the Spectra Assignment Agreements.

A.    *The Mar 1, 2022 Transfer*

150.    The Debtor, with intent to hinder, delay or defraud Nahla, made the March 1, 2022 Transfer.

151.    The Debtor was a joint tenant in the 8438 Account at the time of the Mar 1, 2022 Transfer.

152.    No less than half of the $937,040 balance held in the 8438 Account constituted property of the Debtor's estate at the time of the Mar 1, 2022 Transfer.

153.    The timing of the Debtor's actions to transfer away his assets, and assets held by entities he controlled, to family members and affiliated entities, makes clear that the Debtor engaged in an asset protection scheme intended to hinder, delay or defraud Nahla from collecting on its claims against the Debtor, and that the Debtor made the Mar 1, 2022 Transfer in furtherance of that scheme.

B.    *The Spectra Assignment Agreements*

154.    WW Spectra entered into the Spectra Assignment Agreements through which WW Spectra assigned the Spectra 101 & 111 Equity Interests to KFG.

155.    The Debtor, with intent to hinder, delay or defraud Nahla, executed the Spectra Assignment Agreements on behalf of WW Spectra sometime between June 10, 2022 and July 1, 2022.

156.    The timing of the Debtor's actions to transfer away his assets, and assets held by entities he controlled, to family members and affiliated entities, makes clear that the Debtor engaged in an asset protection scheme intended to hinder, delay or defraud Nahla from collecting

on its claims against the Debtor, and that the Debtor executed the Spectra Assignment Agreements in furtherance of that scheme.

157.    The Debtor dominated and controlled WW Spectra in respect to the execution of the Spectra Assignment Agreements, and WW Spectra had no separate will of its own in respect to the execution of the Spectra Assignment Agreements.

158.    The Debtor used its domination and control of WW Spectra to hinder, delay or defraud Nahla's collection efforts.

159.    WW Spectra is the Debtor's alter ego in respect to the execution of the Spectra Assignment Agreements.

**COUNT II**
**Objection to Discharge**
**11 U.S.C. §§ 1141(d)(3) and 727(a)(2)(A)**

160.    Plaintiff repeats each and every allegation aforementioned as if set forth at length herein.

161.    The Plan provides for the liquidation of all or substantially all of the property of the Debtor's estate.

162.    The Debtor will not be engaged in business after consummation of the Plan.

163.    The Debtor would be denied a discharge under section 727(a) of the Bankruptcy Code if this case were a case under chapter 7, because the Debtor, with intent to hinder, delay or defraud Nahla, transferred or concealed, or permitted to be transferred or concealed, property of the Debtor within one year before the Petition Date, including by making: (a) the M&T Bank Transfer; (b) the One Year Cash Gifts; (c) the Nov 19, 2021 Cash Transfer; (d) the Cash Transfers to JDL; (e) the JDL Spectra Equity Transfer; (f) the Spectra 275 & 525 Equity Transfers; and (g) causing WW Spectra to make the WW Spectra Cash Transfers and the 1 Gold Property Assignment (collectively, the "One Year Transfers").

164.    The timing of the Debtor's actions to transfer away his assets, and assets held by entities he controlled, to family members and affiliated entities, makes clear that the Debtor engaged in an asset protection scheme intended to hinder, delay or defraud Nahla from collecting on its claims against the Debtor, and that in furtherance of that scheme the Debtor made each of One Year Transfers.

165.    The Debtor dominated and controlled WW Spectra in respect to the WW Spectra Cash Transfers and the 1 Gold Property Assignment, and WW Spectra had no separate will of its own in respect to the WW Spectra Cash Transfers and 1 Gold Property Assignment.

166.    The Debtor used its domination and control of WW Spectra to hinder, delay or defraud Nahla's collection efforts through the WW Spectra Cash Transfers and the 1 Gold Property Assignment.

167.    WW Spectra is the Debtor's alter ego in respect to the WW Spectra Cash Transfers and the 1 Gold Property Assignment.

168.    The cash and securities transferred via the One Year Transfers constituted property of the Debtor, or (in the case of the WW Spectra Cash Transfers and the 1 Gold Property Assignment) property of the Debtor's alter ego WW Spectra, at the times of those transfers.

<u>**COUNT III**</u>
**Objection to Discharge**
**11. U.S.C. §§ 1141(d)(3) and 727(a)(4)(A)**

169.    Plaintiff repeats each and every allegation aforementioned as if set forth at length herein.

170.    The Plan provides for the liquidation of all or substantially all of the property of the Debtor's estate.

171.    The Debtor will not be engaged in business after consummation of the Plan.

172.     The Debtor would be denied a discharge under section 727(a) of the Bankruptcy Code if this case were a case under chapter 7, because the Debtor knowingly and fraudulently, in or in connection with the Bankruptcy Case, made false oaths or accounts, including by:

(a)      falsely testifying, in the Sept 7, 2022 Affidavit, that the Spectra 101 & 111 Transfers were made "long before the Nahla Judgment was even a blip on the radar", meaning in January 2020;

(b)      falsely testifying, in the Sept 7, 2022 Affidavit, that the Debtor's full recourse liability to Nahla under the Guaranties was triggered only as a result of his and the Mezz Borrower's unsuccessful attempt to challenge the UCC Sale;

(c)      falsely testifying, in the Lar-Dan Affidavits, that Wonder Works and WW Spectra were not a creditors of the Debtor;

(d)      failing to identify the Debtor's interest in the proceeds from sale of the East 16th Condo on the Schedules;

(e)      failing to identify the Debtor's interest in the 7457 Account on the Schedules; and

(f)      failing to identify the WW Spectra Receivable on the Schedules.

## **RESERVATION OF RIGHTS**

173.     Plaintiff reserves its right to amend this Complaint should facts be discovered that warrant including additional fraudulent transfers or false oaths or accounts by the Debtor as a basis for objection to discharge.

[Remainder of page intentionally left blank.]

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court (a) enter judgment against the Debtor denying discharge and (b) grant such other and further relief as this Court deems just or proper.

Dated: July 19, 2023
        New York, New York

                                        **HUNTON ANDREWS KURTH LLP**

                                        */s/ Robert A. Rich*
                                        Patrick L. Robson
                                        Robert A. Rich
                                        Silvia N. Ostrower
                                        200 Park Avenue
                                        New York, NY 10166
                                        (212) 309-1000
                                        rrich@huntonak.com
                                        probson@huntonak.com
                                        sostrower@huntonak.com

                                        *Counsel to Plaintiff Series 2020A*
                                        *of Nahla Capital LLC*